UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO: 5:17-CV-10-TBR

MICHAEL COOPER,                                                                                    PLAINTIFF

v.

CHRIS VINCENT, *et al.*,                                                                           DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment. [DN 99]. Pro se Plaintiff Michael Cooper responded, [DN 102], and filed a Motion for Leave to File Excess Pages, [DN 103]. Defendants have not responded and the deadline to do so has passed. This matter is ripe for adjudication. For the reasons stated herein: Defendants' Motion for Summary Judgment, [DN 99], is GRANTED and Plaintiff's Motion for Leave to File Excess Pages, [DN 103], is GRANTED.

**BACKGROUND**

Plaintiff Michael Cooper is a prisoner incarcerated in the Kentucky State Penitentiary ("KSP"). [DN 1]. He filed a Complaint and an Amended Complaint against a variety of KSP officials pursuant to 42 U.S.C. § 1983. [DN 1; DN 6]. The Court conducted an initial review and allowed the following claims to continue: 1) Defendants White, Ford, and Vinson violated Plaintiff's First Amendment rights by rejecting magazines mailed to Plaintiff; 2) Defendants Belt, Rodriguez, Beavers, Peede, Coombs, Bauer, Beeler, and Grief retaliated against Plaintiff; 3)

1

Defendants Peede and Coombs violated Plaintiff's Eighth Amendment rights by exercising excessive force against Plaintiff; and 4) Defendants White, Grief, Belt, and Beeler violated Plaintiff's Eighth and Fourteenth Amendment rights by placing him in long-term segregation. [*See* DN 10]. Subsequently, the Court granted Plaintiff's motions to file supplemental complaints and the following claims were added: 5) Defendants Deboe, Coombs, and Inglish violated Plaintiff's Eighth Amendment rights during an altercation on July 13, 2017; 6) Defendants Patton, White, Vinson, Yeager, Grief, and Beavers violated Plaintiff's First and Fourteenth Amendment rights by rejecting legal books mailed to Plaintiff. [*See* DN 67]. Defendants then filed the Motion for Summary Judgment currently before the Court. [DN 99].

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting

*Anderson*, 477 U.S. at 251–52). The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

Additionally, the Court acknowledges that *pro se* pleadings are to be held to a less stringent standard than formal pleadings drafted by attorneys. *See Haines v. Kerner*, 404 U.S. 519 (1972). The duty to be less stringent with *pro se* complainants, however, "does not require [the Court] to conjure up unpled allegations," *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979) (citation omitted), nor to create a claim for a *pro se* plaintiff, *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975).

## DISCUSSION

Defendants argue that the Court should grant their Motion for Summary Judgment on four separate grounds: 1) Plaintiff did not exhaust administrative remedies relating to the rejection of his magazines; 2) Plaintiff did not exhaust administrative remedies relating to his Eighth Amendment claim against Defendants Coombs and Inglish; 3) Defendants Vinson, White, and Ford are entitled to qualified immunity for claims arising out of the rejection of Plaintiff's magazines; and 4) Defendants Patton, White, Yeager, Grief, and Beavers are entitled to qualified

immunity for claims arising out of the rejection of Plaintiff's legal books. [DN 99-1]. The Court will address each argument in turn.

   I.   **Failure to Exhaust Administrative Remedies**

   A. **Rejection of Plaintiff's Magazines**

The Prison Litigation Reform Act ("PLRA") bars a civil rights action challenging prison conditions until the prisoner exhausts "such administrative remedies as are available." 42 U.S.C. § 1997e(a); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). In order to exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *Jones*, 549 U.S. at 218–19. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). However, "failure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants." *Napier v. Laurel Cty. Ky.*, 636 F.3d 218, 225 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 204).

According to the "Inmate Grievance Procedure," contained within the Kentucky Corrections Policies and Procedures ("CPP"), the "Inmate Grievance Process" involves four steps for the filing and adjudication of inmate grievances. [DN 99-2 at 767] At the first step, an informal resolution attempts to resolve the inmate's properly filed grievance. *Id.* The policy requires that the initial grievance must be filed within 5 days after the complained-of incident occurs. *Id.* at

4

768. If a grievant is dissatisfied after step 1, he may request a review by the Grievance Committee. *Id.* at 770. At this second step, the Grievance Committee reviews the grievance and makes a written recommendation. *Id.* at 771. If a grievant still is dissatisfied, he may appeal the grievance to the Warden at step 3. *Id.* at 772. Finally, to conclude the process, if the grievant is dissatisfied with the Warden's decision, at step 4 he may appeal to the Commissioner of the Kentucky Department of Corrections. *Id.* The Inmate Grievance Procedure applies to "any aspect of an inmate's life in prison that is not specifically identified as a non-grievable issue." *Id.* at 762. Grievable issues include personal actions by staff, staff conflict, and health care concerns. *Id.* Non-grievable issues include Parole Board decisions, sentence calculations, and central to this case, rejected mail. *Id.*

In *Figel v. Bouchard*, the Sixth Circuit held that plaintiffs "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004). In that case, the plaintiff filed a civil rights complaint alleging that Michigan prison officials held him in his cell without adequate heating and ventilation. *Id.* The district court dismissed the complaint for failure to exhaust administrative remedies. *Id.* However, the Sixth Circuit reversed the decision pursuant to the Michigan Department of Correction's policy that identified "issues which affect the entire prisoner population or significant numbers of prisoners" as non-grievable. *Id.*; *see Doe v. Michigan Dep't of Corr.*, No. 13-14356, 2016 WL 465496, at *7 (E.D. Mich. Feb. 8, 2016). Specifically, the Court noted, "plaintiff's complaints involving the heat and ventilation in his cell were non-grievable under prison policy because they involve a

significant number of prisoners." *Figel*, 89 F. App'x at 971. Given the "group" nature of the grievance, it should have been categorically rejected by prison officials. *Id.* Thus, the Court concluded that the plaintiff was not required to exhaust administrative remedies regarding the non-grievable issue. *Id.*

The Court finds that the current case is distinguishable from *Figel*. Although Kentucky's CPP identifies the rejection of mail as an issue that should not be raised under its four-step Inmate Grievance Process, the rules provide a separate procedure for appealing the rejection of incoming mail. CPP 16.2(B) states:

> 5. Appeals
>    a. An inmate may appeal a decision to not deliver [incoming mail] in writing to the Warden.
>    b. An inmate shall appeal the rejection within five (5) days of receipt of the notice of rejection.
>    c. The Warden or his designee shall respond in writing within fifteen (15) days of receipt of the inmate's appeal.
>    d. If the appeal is denied, a further appeal shall not be allowed.
>    e. A publisher may appeal a decision to not deliver an item to an inmate to the Commissioner.
>    f. The Commissioner or designee shall respond in writing within fifteen (15) days of receipt of the publisher's appeal.

[DN 99-1 at 752]. The Sixth Circuit has held that "[s]o long as the prison system has an administrative process that will review a prisoner's complaint . . . the prisoner must exhaust his prison remedies." *Owens v. Keeling*, 461 F.3d 763, 769 (6th Cir. 2006) (quoting *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999)). However, where a prison "has a flat rule declining jurisdiction," exhaustion is not required. *Id.* This was the case in *Figel* where the Michigan Department of Corrections had a blanket rule declining jurisdiction over "group issues." However,

6

KSP has an administrative process to address inmate's grievances regarding the rejection of mail. Thus, the Court finds that Plaintiff was required to exhaust administrative remedies related to the rejection of mail before filing a civil rights complaint, despite the fact that rejection of mail is identified as a non-grievable issue pursuant to the Inmate Grievance Procedure.

In this case, Defendants argue that Plaintiff failed to exhaust his administrative remedies in regard to his rejected Straight Stuntin' magazines. [DN 99-1 at 752]. In order to prove that Plaintiff failed to exhaust his administrative remedies, Defendants submitted an affidavit from Warden Randy White. [DN 99-4]. White stated that he had reviewed Plaintiff's records and noted that on January 5, 2017, Plaintiff was given a notice that two mail items were rejected for containing nudity. *Id.* at 793. While the notice contained instructions for appealing the rejection of the unauthorized mail, Plaintiff failed to file a timely appeal of the rejection. *Id.* Since Plaintiff did not file a timely appeal pursuant to CPP 16.2(B), he failed to exhaust his administrative remedies. Thus, the Court finds that the Defendants have carried their burden of proof under the applicable affirmative defense and are entitled to summary judgment on this claim.[1]

### B. Eighth Amendment Claims Against Defendants Coombs and Inglish

Defendants' second argument in support of their Motion for Summary Judgment is that Plaintiff failed to exhaust his administrative remedies in regard to his claim that Defendants Coombs and Inglish violated his Eighth Amendment rights when they failed to stop Defendant Deboe from assaulting him on July 13, 2017. [DN 99-1 at 753].

---

[1] Even if *Figel* were controlling and Plaintiff was not required to exhaust KSP's administrative remedies regarding the rejection of mail, the Court finds that Defendants are still entitled to summary judgment on this claim based on qualified immunity, as will be discussed below.

As previously discussed, the Prison Litigation Reform Act bars a civil rights action challenging prison conditions until the prisoner exhausts "such administrative remedies as are available." 42 U.S.C. § 1997e(a). The Kentucky CPP allows inmates to file grievances relating to "any aspect of an inmate's life in prison that is not specifically identified as a non-grievable issue," including staff conflicts. [DN 99-2 at 762]. When filing a grievance, CPP 14.6(J)(1)(5) states: "The grievant shall include all aspects of the issue and identify all individuals in the 'Brief Statement of the Problem' section of the written grievance so that all problems concerning the issue or individuals may be dealt with during step 1." *Id.* at 768. In instances where the inmate may be in physical danger, the grievance is first reviewed by the Warden. *Id.* at 770. If the inmate is not satisfied with the Warden's decision, they may appeal to the Commissioner and explain "why the Warden's decision did not resolve the grievance." *Id.* at 772.

Plaintiff filed a staff conflict grievance relating to the July 13, 2017 incident. [DN 99-8 at 803]. Specifically, he stated:

> On July 13th 2017 I was assaulted by c/o Chad Debo. He punched me in my ribs, tried to break my arms, slammed my head on the toilet, slammed my head against the wall, I have bruises on my arms and shoulders. Nurse Jessica Miller checked me and said there was nothing wrong with me. I've had a head ache since, I'm having shoulder pain, neck pain lower back pain.

*Id.* On August 2, 2017, Warden White responded that the issue was currently under investigation, *Id.* at 806, and within 5 days, Plaintiff appealed the Warden's decision to the Commissioner, *Id.* at 807. In his appeal, Plaintiff included the following statement: "No time during the assault did

Jessee Coombs Lt. or Brendan Inglish try to stop c/o Nathaniel Deboe from assaulting me . . . ." *Id.*

Based on the prison's policies and procedures, Plaintiff failed to exhaust his administrative remedies relating to his Eighth Amendment claim against Coombs and Inglish. CPP 14.6(J)(1)(5) states that the initial grievance "shall include all aspects of the issue and identify all individuals" involved in the incident. [DN 99-2 at 768]. While the Sixth Circuit does "not require a prisoner's grievance to allege a specific legal theory or facts that correspond to all the required elements of a particular legal theory," *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006), "a grievance must provide notice of the problem at hand." *Pruitt v. Holland*, No. 10-CV-111-HRW, 2011 U.S. Dist. LEXIS 621, 2011 WL 13653, at *5 (E.D. Ky. 2011) (citing *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009)). Plaintiff's grievance failed to notify the Warden of Coombs and Inglish's involvement in the altercation and Plaintiff's claims against them. Moreover, the fact that Plaintiff mentioned Coombs and Inglish in his appeal of the Warden's decision does not perverse his claim given that the purpose of an appeal to the Commissioner is to explain why the Warden's decision did not resolve the grievance, not to add new claims against new individuals. Therefore, the Court finds that Plaintiff failed to exhaust his administrative remedies in regard to this claim and Defendants are entitled to summary judgment.

## II. Qualified Immunity

Defendants raise two qualified immunity arguments in support of their Motion for Summary Judgment. Pursuant to the doctrine of qualified immunity, "government officials

performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The question of whether qualified immunity is available to a defendant involves a two-step process: "[f]irst, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred." *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002). Then, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194 (2001). In order for a law to be deemed as "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bell*, 308 F.3d at 602. In other words, "the unlawfulness [of the action] must be apparent." *Id.* "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.*

In this case, Plaintiff claims his First Amendment rights were violated when Defendants rejected his mail, specifically two Straight Stuntin' magazines and four legal books. Prisoners are not without the protections of the First Amendment while incarcerated, including the right to free

exercise of religion. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987); *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Cruz v. Beto*, 405 U.S. 319 (1972) (*per curiam*). However, such constitutional protections can be limited in the context of valid penological objectives. *O'Lone*, 482 U.S. at 348; *Pell*, 417 U.S. at 822–23. Thus, even where they may infringe on a prisoner's constitutional rights, prison regulations that are "reasonably related to legitimate penological interests" are valid. *O'Lone*, 482 U.S. at 349; *Turner v. Shafley*, 482 U.S. 78, 89 (1987).

In *Turner v. Shafley*, the Supreme Court adopted a four factor test to determine whether a prison regulation is reasonable. 482 U.S. at 89–91. First, "there must be a 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S. Ct. 3227, 82 L.Ed. 2d 438 (1984)). Second, in determining whether a restriction is reasonable, the court must ask "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Third, the court must also consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, the Court instructed that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," but that "[b]y the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.* (citation omitted). "But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* As the Sixth Circuit has noted,

"a trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (citations omitted). Rather, "[t]he four *Turner* factors are . . . simply 'relevant' to the ultimate inquiry a court must undertake 'when a prison regulation impinges on inmates' constitutional right': determining whether a prison regulation is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89)).

### A. Plaintiff's Magazines

Defendants argue that Vinson, White, and Ford are entitled to qualified immunity for claims arising out of the rejection of Plaintiff's Straight Stuntin' magazines. [DN 99-1 at 757]. Plaintiff's magazines were rejected pursuant to CPP 16.2 which provides that mail containing sexually explicit material will be rejected by prison staff. [DN 99-3 at 789; DN 99-6 at 797].

Applying the *Turner* test to the facts of Plaintiff's case, the Court finds that Defendants' rejection of sexually explicit mail was related to a legitimate penological interest. First, KSP has an interest in limiting inmates' access to sexually explicit materials because such depictions "pose a threat to the security, good order, and discipline of the institution and may facilitate criminal activity." [DN 99-1 at 757 (citing CPP 16.2(D))]. Moreover, "sexually explicit materials further present a significant risk of sexual harassment of employees." *Id.*; *Rogers v. Martin*, 84 F. App'x 577, 579 (6th Cir. 2003) (affirming district court's decision that the prison's policy of restricting sexually explicit materials was rationally related to the goal of a safer prison environment). Second, the Court notes there are alternative means of exercising the asserted constitutional right

because inmates are not barred from receiving mail entirely, only mail that includes sexually explicit images. Moreover, as noted in *Rogers v. Martin*, inmates presumably have "alternative means of acquiring sexually explicit materials such as written descriptions of sex acts." *Rogers*, 84 F. App'x at 579; CPP 16.2 ("Sexually explicit, for purposes of this policy only, means nudity or pictorial depictions of actual or simulated sexual acts . . ."). Third, accommodating inmates' rights to receive sexually explicit materials may adversely affect prison staff and inmates by disturbing security, order, and discipline in the facility, and creating a "sexually charged atmosphere." *Id.* Finally, Plaintiff has failed to suggest an alternative policy that fully accommodates prisoners' rights. The absence of ready alternatives is evidence of the reasonableness of the regulation. Thus, the Court finds that the *Turner* factors weigh in favor of Defendants and they are entitled to summary judgment as to Plaintiff's First Amendment claim.

### B. Rejection of Plaintiff's Legal Books

Additionally, Defendants Patton, White, Vinson, Yeager, Grief, and Beavers argue they are entitled to qualified immunity on Plaintiff's claim that the rejection of his legal books violates his First Amendment rights. [DN 99-1 at 758]. Plaintiff books were rejected pursuant to KSP's policy prohibiting third parties from ordering books for inmates. [DN 99-9 at 808].

"Prison policies regulating prisoner access to printed material frequently come under scrutiny." *Bethel v. Jenkins*, No. 2:15-CV-3016, 2019 WL 917122, at *4 (S.D. Ohio Feb. 25, 2019). "Publisher only" rules, or policies that prohibit prisoners from receiving books unless the publisher sends them directly to the inmate, have been upheld by the Supreme Court. *See Bell v.*

*Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1969). "Courts, however, have invalidated prison policies that are more restrictive than the publisher only policy." *Bethel*, 2019 WL 917122, at *5 (collecting cases). Recently, an Ohio district court analyzed a prison policy barring third parties from ordering books for inmates. *See id.* The policy was implemented in response to third parties concealing contraband between the pages of books and then repacking books so that they appear to be coming to the prison directly from a publisher. *Id.* at *5. For example, two inmates received cell phones hidden in books appearing to be shipped directly from Barnes and Nobel. *Id.* However, under the prison's policy requiring inmates to order their own books, the facility can use tracking numbers to verify that the book is actually shipped from a publisher and therefore does not contain contraband. *Id.* Ultimately, the court found this policy was reasonably related to legitimate penological interests. *Id.*

Applying the *Turner* test to the facts of Plaintiff's case, the Court finds that Defendants' policy of rejecting books ordered by third parties is related to a legitimate penological interest. First, KSP claims it has an interest in restricting materials sent to inmates from third parties after several incidents in which third-party book orders were found to contain drug contraband. [DN 99-4 at 794]. Specifically, the Warden asserted:

> Individuals were filling books with drug contraband, and falsifying shipping information to make it appear as if the books were ordered from a book publisher. It became necessary for institutional security to require inmates to order their own books, rather than permit family members and others to purchase books for inmates, so that the prison could be sure that the books were not sent in for the purpose of introducing drug or other contraband into the prison.

*Id.* The Court finds that there is a valid rational connection between the policy denying book orders from third parties and the government's interest in stopping the flow of drugs and other contraband into the prison. Second, inmates retain the right to receive books—they are merely required to order the books themselves. Moreover, third parties presumably retain the ability to finance inmates' book purchases by adding funds to the inmates' accounts at KSP. *See Bethel*, 2019 WL 917122, at *4. Third, allowing inmates to receive books ordered by third parties would adversely affect prison staff who would be required to check individual pages of such books in order to determine whether it contained contraband. Finally, Plaintiff does not suggest an alternative policy that fully accommodates his rights at a *de minimis* cost to valid penological interests. The absence of ready alternatives is evidence of the reasonableness of the regulation. Thus, the Court finds that the *Turner* factors weigh in favor of Defendants and they are entitled to summary judgment as to Plaintiff's First Amendment claim. [2]

### III. Plaintiff's Remaining Claims

In their Motion for Summary Judgment, Defendants address only three of Plaintiff's outstanding claims: the First Amendment claim regarding the rejection of Plaintiff's Straight Stuntin' magazines; the Eighth Amendment claim against Coombs and Inglish; and the First Amendment claim for the rejection of Plaintiff's legal books. [DN 99-1]. Defendants argue Plaintiff abandoned his remaining claims by failing to include them in his pre-trial memorandum. *Id.* at 748. Defendants cite no legal authority in support of this position. *Id.* While the Court

---

[2] The Court notes that Defendants' Motion for Summary Judgment did not address Plaintiff's Fourteenth Amendment due process claim regarding the rejection of his legal books. Thus, that claim is not subject to summary judgment.

acknowledges that Plaintiff's pretrial memorandum lacks information regarding many of his claims, a *pro se* plaintiff's pleadings are held to a less stringent standard than that of an attorney. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). Therefore, the Court does not find that Plaintiff's failure to discuss each of his claims in the pretrial memorandum constitutes a complete waiver of those claims. In light of this finding, the Court will permit Defendants to file an additional motion for summary judgment regarding Plaintiff's remaining claims within twenty-one (21) days of the publication of this Memorandum Opinion and Order.

## CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED**: Defendants' Motion for Summary Judgment, [DN 99], is **GRANTED** as to the following claims: 1) Defendants White, Ford, and Vinson violated Plaintiff's First Amendment rights by rejecting magazines mailed to Plaintiff; 2) Defendants Coombs and Inglish violated Plaintiff's Eighth Amendment rights during an altercation on July 13, 2017; and 3) Defendants Patton, White, Vinson, Yeager, Grief, and Beavers violated Plaintiff's First Amendment rights by rejecting legal books mailed to Plaintiff. Plaintiff's Motion for Leave to File Excess Pages, [DN 103], is **GRANTED**.

**IT IS SO ORDERED.**

*Thomas B. Russell*

Thomas B. Russell, Senior Judge
United States District Court

October 28, 2019

CC: Attorneys of Record;
**Michael Cooper**, 211158
KENTUCKY STATE PENITENTIARY
266 Water Street
Eddyville, KY 42038